IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| TIMOTHY WAYNE CULBREATH | ) | CIVIL ACTION NO. 9:15-1788-MGL-BM |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

The Plaintiff filed the complaint in this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner wherein he was denied disability benefits. This case was referred to the undersigned for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a)(D.S.C.).

Plaintiff applied for Disability Insurance Benefits (DIB) on February 2, 2012, alleging disability beginning January 18, 2012, due to "cervical cord problems from old injury." (R.pp. 9, 136, 159) Plaintiff's claim was denied both initially and upon reconsideration. Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"), which was held on October 9, 2013. (R.pp. 23-56). The ALJ thereafter denied Plaintiff's claim in a decision issued January 17, 2014. (R.pp. 9-18). The Appeals Council denied Plaintiff's request for a review of the ALJ's decision, thereby making the determination of the ALJ the final decision of the Commissioner. (R.pp. 1-3).

Plaintiff then filed this action in United States District Court. Plaintiff asserts that there is not substantial evidence to support the ALJ's decision, and that the decision should be



reversed and remanded for further consideration. The Commissioner contends that the decision to deny benefits is supported by substantial evidence, and that Plaintiff was properly found not to be disabled.

### Scope of review

Under 42 U.S.C. § 405(g), the Court's scope of review is limited to (1) whether the Commissioner's decision is supported by substantial evidence, and (2) whether the ultimate conclusions reached by the Commissioner are legally correct under controlling law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Richardson v. Califano, 574 F.2d 802, 803 (4th Cir. 1978); Myers v. Califano, 611 F.2d 980, 982-983 (4th Cir. 1980). If the record contains substantial evidence to support the Commissioner's decision, it is the court's duty to affirm the decision. Substantial evidence has been defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. **If there is evidence to justify refusal to direct a verdict were the case before a jury, then there is "substantial evidence."** [emphasis added].

Hays, 907 F.2d at 1456 (citing Laws v. Celebrezze, 368 F.2d 640 (4th Cir. 1966)); see also, Hepp v. Astrue, 511 F.3d 798, 806 (8th Cir. 2008)[Noting that the substantial evidence standard is even "less demanding than the preponderance of the evidence standard"].

The Court lacks the authority to substitute its own judgment for that of the Commissioner. Laws, 368 F.2d at 642. "[T]he language of [405(g)] precludes a *de novo* judicial proceeding and requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).



**Discussion**

A review of the record shows that Plaintiff, who was fifty years old at the time he alleges he became disabled, has a high school education and past relevant work experience as a truck driver. (R.pp. 16, 30, 155, 159-160 ). In order to be considered "disabled" within the meaning of the Social Security Act, Plaintiff must show that he has an impairment or combination of impairments which prevent him from engaging in all substantial gainful activity for which he is qualified by his age, education, experience, and functional capacity, and which has lasted or could reasonably be expected to last for a continuous period of not less than twelve (12) months. After a review of the evidence and testimony in the case, the ALJ determined that, although Plaintiff does suffer from the "severe" impairments[1] of status post right rotator cuff repair, degenerative disc disease of his cervical spine, and cervical spondylosis with disc protrusion (R.p. 11), he nevertheless retained the residual functional capacity ("RFC") for a range of light[2] work, with limitations of no concentrated exposure to hazards such as unprotected heights and machinery; no more than occasional climbing of ladders, ropes, or scaffolds; and no more than frequent climbing of ramps or stairs, balancing, stooping, kneeling, crouching, crawling, or overhead reaching with his right upper extremity. (R.p. 14). At step four, the ALJ found that Plaintiff was unable to perform any of his past relevant work with these limitations. (R.p. 16). However, the ALJ obtained testimony from a vocational expert ("VE") and

---

[1]An impairment is "severe" if it significantly limits a claimant's physical or mental ability to do basic work activities. See 20 C.F.R. § 404.1521(a); Bowen v. Yuckert, 482 U.S. 137, 140–142 (1987).

[2]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

3



found at step five that Plaintiff could perform other jobs existing in significant numbers in the national economy with this RFC, and was therefore not entitled to disability benefits. (R.pp. 16-17).

Plaintiff asserts that in reaching this decision, the ALJ erred by performing a flawed credibility analysis, by failing to properly consider the combination of the effects of his various impairments, and by performing a flawed Listing[3] analysis (specifically, that she failed to identify which Listing was considered). However, after a careful review and consideration of the evidence and arguments presented, the undersigned finds and concludes for the reasons set forth hereinbelow that there is substantial evidence to support the decision of the Commissioner, and that the decision should therefore be affirmed.

### Medical Record

The record reflects that on February 10, 2011 (about a year before Plaintiff claims he became disabled), he was examined at the Eau Claire Cooperative Health Centers-Waverly Family Practice (Waverly) for hypertension, dermatitis, and tobacco abuse. It was noted that he had had carpal tunnel surgery in January 2011. (R.p. 203). Plaintiff returned to Waverly on June 17, 2011, at which time his prescriptions for Nizoral, Medrol, Neurontin, and Aristocort cream were renewed, and an x-ray was ordered to determine the source of Plaintiff's chronic neck pain. (R.p. 202). Plaintiff was thereafter examined by Dr. Robert S. Cole at Waverly on November 15, 2011, for his complaints of headache and back pain. It was noted that Plaintiff had a history of a right shoulder

---

[3]In the Listings of Impairments, "[e]ach impairment is defined in terms of several specific medial signs, symptoms, or laboratory test results." <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530 (1990). A claimant is presumed to be disabled if his or her impairment meets or is medically equivalent to the criteria of an impairment set forth in the Listings. <u>See</u> 20 C.F.R. § 416.925.



rotator cuff injury and associated right hand paresthesias, and Dr. Cole assessed pyuria and lower back pain. (R.pp. 198-200).

On November 18, 2011, Plaintiff returned to Dr. Cole with a complaint of right-sided pain, and he was referred to a neurologist for evaluation of his chronic right arm numbness and paresthesias. (R.p. 198). In January 2012, Plaintiff was examined at Waverly for complaints of arm pain and tingling in his upper extremities. (R.pp. 285-288). On January 21, 2012, Plaintiff had a cervical spinal MRI which indicated that he had no evidence of a disc herniation or spinal stenosis at C2-3; a broad based disc protrusion at C3-4 with associated minor left-sided posterior spondylosis, but with satisfactory disc space height and no focal herniation or significant compromise of the central cord; right-sided disc protrusion at C5-6 which produced mild mass effect upon the right ventral aspect of the cord, but with only a "mild" narrowing of the disc space; well maintained disc space height at C6-7 with no evidence of a disc herniation or central canal stenosis; and right-sided disc herniation at C7-T1 which extended into the right C7-T1 foramen with a slight effacement of the right ventral margin of the cord, and with only "mild" narrowing of the disc space. There was no abnormal signal noted within the cord, and vertebral body height was well maintained. (R.pp. 257-258). Plaintiff alleges he was now disabled at this time.

Plaintiff was referred to neurosurgery on January 25, 2012, and prescribed Cyclobenzaprine, Gabapentin, and Tramadol on January 26, 2012. (R.p. 285). Plaintiff was thereafter examined by Dr. C. Phillip Toussaint at the University of South Carolina School of Medicine/University Specialty Clinics on January 27, 2012. Plaintiff complained of bilateral upper extremity numbness, left greater than right, involving the entire upper extremity. On examination Dr. Toussaint noted that Plaintiff had right upper extremity hand intrinsic weakness of 4/5, but



otherwise had 5/5 (full) muscle strength and normal tone in that extremity. Plaintiff's left upper[4] extremity was significant for weakness in hand intrinsic 4-/5, but was again otherwise 5/5 with normal tone. Plaintiff's lower extremities were also both 5/5 with normal tone. Sensory examination was diminished in Plaintiff's left hand in an ulnar distribution and in the right hand over his index finger. Plaintiff had no significant pathological reflexes, and his gait was stable. Plaintiff had positive Tinel signs[5] over the bilateral supraclavicular brachial plexus and bilateral cubital tunnels, but a negative Romberg.[6] Dr. Toussaint wrote that he had reviewed Plaintiff's cervical spine MRI, his cervical spine x-ray, and records of Plaintiff's prior evaluations, and opined that Plaintiff had cervical spondylosis with no signs of myelopathy. Dr. Toussaint noted that he had difficulty relating Plaintiff's bilateral upper extremity symptoms to his cervical spine MRI findings. He also did not feel that Plaintiff's symptoms were clearly described by Plaintiff's MRI findings of his neck. Dr. Toussaint referred Plaintiff for a cervical epidural steroid injection and recommended that he undergo another EMG of his upper extremities. (R.pp. 255- 256).

Plaintiff thereafter had EMG and nerve conduction studies performed on March 6, 2012. Dr. J. E. Carnes of the South Carolina Neurological Clinic noted that the nerve conduction studies of Pplaintiff's median and ulner nerves bilaterally were "unremarkable", while there was no

---

[4]The record reads "left lower extremity," but this appears to be a scrivener's error based on the reference to Plaintiff's left upper extremity and to Plaintiff's hand, as well as the later discussion of his lower extremities. (See R.p. 256).

[5]The sign that a nerve is irritated. Tinel's sign is positive when lightly banging (percussing) over the nerve elicits a sensation of tingling, or 'pins and needles,' in the distribution of the nerve. http://www.medicinenet.com/script/main/art.asp?articlekey=16687, 2012.

[6]A Romberg test is an indication of loss of the sense of position in which the patient loses balance when standing erect, feet together, and eyes closed. http://medical-dictionary.thefreedictionary.com/Romberg's+test, 2009.



clear evidence of thoracic outlet syndrome[7] and only "very slight" changes in Plaintiff's left upper extremity. (R.pp. 222-223).

On March 22, 2012, Plaintiff was examined by Amy J. Clark, a board certified family nurse practitioner at Palmetto Pain Management, for complaints of upper neck and arm pain as well as thoracic and cervical spine pain related to rotator cuff surgery in 2009. Plaintiff complained that Tramadol affected him adversely, and that although Flexeril helped him, he did not want to be on medications and wanted "to be able to function." Plaintiff rated his pain level as 5 on a 10 point scale. On examination Plaintiff had reasonably full range of motion of the cervical spine in all planes, although he was not tested in the "extreme"; he had active full range of motion and well-preserved strength in his upper extremities; and his gait was "unremarkable". A cervical epidural steroid injection was recommended. (R.pp. 220-221). Dr. Ezra B. Riber with Palmetto Pain Management also recommended a cervical epidural injection procedure on April 6, 2012. (R.p. 236).

On May 8, 2012, Plaintiff presented to Dr. Toussaint complaining about bilateral upper extremity numbness and pain since 2009 and cramping in his lower bilateral extremities. He had not undergone any epidural steroid injections, but reportedly had taken Ultram, Flexeril, and Neurontin without significant relief. Dr. Toussaint noted a previous EMG which showed a possibility of mild left-sided C8 radiculitis, and a previous MRI that showed right-sided C5-6 and C7-T1

---

[7]Thoracic outlet syndrome is "any of a variety of neurovascular syndromes resulting from compression of the subclavian artery, the brachia plexus nerve trunks, or less often the axillary vein or subclavian vein, by thoracic outlet abnormalities such as a drooping shoulder girdle, a cervical rib or fibrous band, an abnormal first rib, or occasionally compression of the edge of the scalenus anterior muscle. Continual hyperabduction of the arm may cause another variety (*hyperabduction s.*). Arterial compression leads to ischemia, paresthesias, numbness, and weakness of the affected arm, sometimes with Raynaud phenomenon of the arm. Nerve compression causes atrophy and weakness of the muscles of the hand and, in advanced cases, of the forearm, with pain and sensory disturbances in the arm." Dorland's Illustrated Medical Dictionary, 1850 (32nd ed. 2012).



herniation. On examination Plaintiff displayed right-sided biceps weakness (4/5) and bilateral hand intrinsic weakness (again, 4/5), and Dr. Toussaint opined that Plaintiff appeared to have symptoms consistent with neurogenic thoracic outlet syndrome of the disputed type. He noted that Plaintiff was scheduled to have a cervical epidural steroid injection, and he thought that Plaintiff might benefit from C5-6, C7-T1 anterior cervical discectomy and fusion. (R.pp. 216-217).

On May 9, 2012, Dr. Damon Daniels of Wellspring Family Medicine performed a consultative examination. Plaintiff reported that he had been involved in a tractor-trailer accident in 2000 which resulted in soft tissue injuries in his neck. He also told Dr. Daniels that he had suffered a rotator cuff tear in 2009 of a joint that previously had been injured and surgically repaired, and previously underwent surgeries for right rotator cuff repair and carpal tunnel release. Plaintiff complained of sharp pains in his legs as well as intermittent numbness in his arms, and reported that he could walk continuously for thirty minutes, stand continuously for thirty minutes, sit continuously for fifteen minutes, and comfortably lift ten to fifteen pounds. On examination Dr. Daniels' found Plaintiff to be well developed, well-nourished and in no acute distress. Plaintiff had equal and symmetrical muscle bulk in his upper and lower extremities bilaterally; he was able to tandem walk and toe walk, although he was unsteady in both feet with heel walk; he was able to squat about fifty percent of the way down; he moved from a chair to the examination table without any difficulty; there were no apparent deformities in his upper or lower extremities bilaterally; he had normal range of motion of his lumbar spine, elbows, wrists, knees, hips, and ankle; he had cervical spine range of motion of 30/50 degrees with flexion, 40/60 degrees with extension, 30/45 degrees with lateral flexion, and 60/80 degrees with rotation; he had normal range of motion in his left shoulder; right shoulder range of motion of 120/150 degrees with abduction and 130/150 degrees with forward

8



elevation; and intact internal and external rotation. Plaintiff's hands had no joint deformity, swelling, or decreased range of motion; his fine and gross manipulation were intact; and grip strength in both hands was 4/5. Muscle strength was 4/5 in the proximal and distal muscle groups of Plaintiff's upper and lower extremities. Sensation was decreased to light touch from Plaintiff's elbow to the dorsum of both hands, pinprick was intact to upper extremities, and lower extremity sensory examination was normal. Reflexes were 2+ bilaterally in the upper and lower extremities. Dr. Daniels assessed Plaintiff with chronic neck pain, cervical spine degenerative disc disease, chronic right shoulder pain, and numbness in his arms. He thought Plaintiff's symptoms were consistent with cervical disc disease. (R.pp. 207-210).

Dr. Ezra administered a cervical steroid injection on May 16, 2012. (R.p. 231). On May 21, 2012, x-rays of Plaintiff's cervical spine showed probable partial fusion at the C2-C3 level (both at the disc space and posterior element level), no evidence of fracture or subluxation, and mild degenerative disc disease at C5-C6 and C7-T1. (R.p. 218). A cervical spine CT (without contrast) the same day revealed near complete developmental fusion at C2-3 with no malalignment or fracture, no destructive bone lesion, and no significant soft tissue findings outside the spine. Plaintiff had only some "mild" degenerative disc changes at C3-4 with no significant canal or foraminal encroachment suspected; only minimal broad disc protrusions at C4-5; a "somewhat deeper" protrusion at C5-6 with likely "mild" canal stenosis and foraminal encroachment on that side; a patent appearing spinal canal at C6-7; and central disc and osteophyte protrusion at C7-T1 without severe stenosis. The impression was developmental fusion at C2-3 (anteriorly and posteriorly), and multilevel small disc protrusions and mild spondylotic changes. (R.p. 219).

9



On May 23, 2012, state agency physician Dr. James Key opined after a review of Plaintiff's medical records and findings that Plaintiff's impairments did not satisfy the criteria of a listed impairment and that Plaintiff could perform a range of light work. (R.pp. 59-62, 65).

On May 30, 2012, Plaintiff complained to Dr. Toussaint about numbness in his right upper extremity and low back pain radiating into his bilateral lower extremities to his calf. Examination revealed that Plaintiff's bilateral upper extremities were 5/5 throughout with normal tone, he had symmetric pinprick bilaterally in both upper and lower extremities, and unremarkable deep tendon reflexes. Dr. Toussaint's impression was that Plaintiff had disc herniations at C5-6 and C7-T1 and slight improvement with injection therapy. The plan was for Plaintiff to continue injections, start physical therapy, and have another MRI of his lumbar spine. (R.pp. 214-215).

On June 13, 2012, Plaintiff reported to PAC Michael Robichaud that the cervical epidural steroid injection only improved his symptoms for a couple of days, but that his medications (Neurontin, Norco, and Advil) were working reasonably well for him. Plaintiff had a "somewhat limited" range of motion in his cervical spine, but had "negative" Spurling's,[8] flexion and extension, with 5/5 strength (including grip strength) bilaterally and a normal gait. A repeat cervical epidural steroid injection at C6-7 was suggested. (R.p. 232). On June 28, 2012, Plaintiff complained to Dr. Riber that he did not receive any significant relief from his prior cervical epidural, and Dr. Riber cancelled the scheduled procedure. Examination revealed that Plaintiff had reasonably full range of motion of his cervical spine, his grip strength was perhaps a trace diminished on the right as

---

[8]A medical maneuver used to assess nerve root pain (aka radicular pain). The examiner turns the patient's head to the affected side while extending and applying downward pressure to the top of the patient's head. http://www.medilexicon.com/medicaldictionary.php?t=90833, 2006.



compared to the left, and he had a nonantalgic gait. Plaintiff was referred back to Dr. Toussaint, with Dr. Riber suggesting that a work up for thoracic outlet syndrome should be considered. (R.p. 233).

On July 11, 2012, Plaintiff complained of significant neck and right arm pain with paresthesias, headache, and back and leg pain. Dr. Toussaint recommended anterior cervical discectomy and fusion at C5-6 and C7-T1. (R.p. 269). On August 17, 2012, Plaintiff had a follow up examination at Waverly for hypertension. (R.p. 284). A comprehensive metabolic panel was done at The Free Medical Clinic on October 22, 2012. (R.p. 243).

On October 2, 2012, state agency physician Dr. Ellen Humphries opined that Plaintiff did not satisfy the criteria of a listed impairment and that Plaintiff could perform a range of light work. (R.pp. 70-74, 77).

Plaintiff continued to be followed by the Waverly Clinic and obtained prescription medications (including medication changes), examinations, routine blood work, and help in completing prescription assistance paperwork from November 2012 through June 2013. (R.pp. 277-278, 280-281, 283-284, 328, 329). On April 23, 2013, Plaintiff complained that his lower back pain increased with some shooting pain down the back of his legs and tingling in his fingers intermittently. Even so, he had full range of motion in all extremities. It was noted that Plaintiff had been working in the garden more and had been walking to hand out flyers. (R.p. 329). On July 3, 2013, Plaintiff said he had been doing well as to his back pain until the previous week when he started doing car washes with community fund raisers. Plaintiff was assessed with lower back pain, sinus arrhythmia, and benign essential hypertension, and was advised to avoid strenuous activity involving frequent bending and turning, rest, and to continue treatment. (R.pp. 275-277).



# I.

## (Credibility)

Plaintiff initially argues that the ALJ committed reversible error in her evaluation of Plaintiff's subjective testimony and credibility.  This argument is without merit.  In section 3 of her decision, the ALJ specifically discussed Plaintiff's impairments and the medically acceptable evidence and found that while Plaintiff had medically determinable physical impairments that could reasonably be expected to produce some of his symptoms, his claims were not credible to the extent inconsistent with the RFC set forth in the decision.  (R.pp. 11-13).  The ALJ wrote:

> Even though the claimant has medically determinable impairments that could reasonably cause some of his reported symptoms, the "objective evidence" does not support the alleged severity (see Findings 3 and 5 discussions).

(R.p. 12).  In section 5 of her decision, the ALJ again specifically references the two-part test for evaluating a claimant's symptoms and then states that "[a]s shown in the above Findings, the objective medical evidence does not support the severity alleged by the claimant (see Finding 3 discussion)."  (R.p. 14).  See generally, (R.pp. 15-16).

Plaintiff appears to argue that the ALJ improperly evaluated the intensity, persistence, and limiting effects of his pain "to determine the extent to which the symptoms affect the individual's ability to do basic work activities,"  SSR 96-7p, because the ALJ merely stated that the objective evidence did not support the severity alleged.  However, a review of the ALJ's decision shows that the ALJ did not just consider the objective evidence, but also considered Plaintiff's testimony and reports of pain in determining that he was not as limited as he claimed, noting that Plaintiff was not fully credible not only based on the objective evidence, but also that Plaintiff's activities were inconsistent with his testimony.  (R.pp. 15-16).  Ables v. Astrue, No. 10–3203, 2012 WL 967355,



at *11 (D.S.C. Mar. 21, 2012) ["Factors in evaluating the claimant's statements include consistency in the claimant's statements, medical evidence, medical treatment history, and the adjudicator's observations of the claimant."](citing SSR 96-7p).  In doing so, the ALJ specifically noted that Plaintiff reported a wide range of daily activities which were compatible with work duties at the light exertional level.  See Johnson v. Barnhart, 434 F.3d 650, 658 (4th Cir. 2005) [Accepting ALJ's finding that claimant's activities were inconsistent with complaints of incapacitating pain where she engaged in a variety of activities]; Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001).

In particular, that Plaintiff lived with and was the primary caregiver to his 71 year old father (who had had strokes in 2011), that he drove daily, drove to the hearing before the ALJ, cooked, cleaned, shopped, washed laundry, took his father to church, attended community meetings, attended county association meetings, and used a computer.  The ALJ also discussed Plaintiff's August 2012 function report in which Plaintiff stated that he took care of his father, including providing meals, assisting with bathing, clothing, and transporting his father to the doctor.  Plaintiff reported that he could perform his personal care tasks with some problems; that he prepared complete meals daily; cleaned daily; did laundry weekly; went outside daily; walked; drove a car; shopped in stores for groceries, clothing, and cleaning supplies; handled monetary affairs; read; watched television; socialized over the telephone, on a computer, and in person; and had no problems getting along with family friends, neighbors, and others.  (R.pp. 15-16; 173-179).  Additionally, as noted by the ALJ, Plaintiff reported in April 2013 that he had been working in his garden more and was even walking around handing out flyers, and that in July 2013 he was walking daily and doing car washes with community fund raisers.  (R.pp. 16, 275-276, 279).



Turning to the objective medical evidence, the ALJ noted that none of Plaintiff's physicians had imposed any permanent restrictions on him or documented that Plaintiff was disabled or unable to work. (R.p. 16). Goodwater v. Barnhart, 579 F.Supp. 746, 757 (D.S.C. 2007)[Noting no physician ever opined that Plaintiff was disabled]; Lee v. Sullivan, 945 F.2d 687, 693 (4th Cir. 1991)[Finding that where no physician opined that Plaintiff was totally and permanently disabled supported a finding of no disability]. She also noted that Plaintiff did not complain at the hearing that his medications were ineffective, and that although Plaintiff complained of drowsiness and decreased focus and attention from his medications, the medical record showed that when Plaintiff complained of side effects to his medical providers they changed his medications or adjusted the dosage. (R.p. 15). While Plaintiff argues that the ALJ overestimated his functioning and erred in evaluating his testimony and the medical records to which she afforded significant weight, the duty to consider the evidence and resolve any conflicts in that evidence rests with the ALJ: not with the Plaintiff, and not with this Court. Hays, 907 F.2d at 1456 [It is the responsibility of the ALJ to weigh the evidence and resolve conflicts in that evidence]; Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996) ["The duty to resolve conflicts in the evidence rests with the ALJ, not with a reviewing court"]; see also Guthrie v. Astrue, No. 10-858, 2011 WL 7583572, at * 3 (S.D. Ohio Nov. 15, 2011), adopted by, 2012 WL 9991555 (S.D.Ohio Mar. 22, 2012)[Even where substantial evidence may exist to support a contrary conclusion, "[s]o long as substantial evidence exists to support the Commissioner's decision . . . this Court must affirm."].

In sum, a review of the decision shows that in determining that the evidence did not support the severity of impairments as alleged by Plaintiff, the ALJ discussed both the medical records and Plaintiff's testimony, and noted that she made her finding on the credibility of Plaintiff's



statements "based on a consideration of the entire case record." (R.p. 14, see R.pp. 11-16). That is

what she is supposed to have done. See SSR 96–7p, 1996 WL 374186, at *2 [Where a claimant seeks

to rely on subjective evidence to prove the severity of her symptoms, the ALJ "must make a finding

on the credibility of the individual's statements, based on a consideration of the entire case record."];

Mickles v. Shalala, 29 F.3d 918, 925-926 (4th Cir. 1994) [In assessing the credibility of the severity

of reported subjective complaints, consideration must be given to the entire record, including the

objective and subjective evidence]. Further, when objective evidence conflicts with a claimant's

subjective statements, an ALJ is allowed to give the statements less weight. See SSR 96–7p, 1996

WL 374186, at *1; Craig v. Chater, 76 F.3d 595 (4th Cir. 1996) ["Although a claimant's allegations

about her pain may not be discredited solely because they are not substantiated by objective evidence

of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the

available evidence, including objective evidence of the underlying impairment."].

        After a review of the record and evidence in this case, the undersigned can find no

reversible error in the ALJ's treatment of the subjective testimony given by the Plaintiff. Jolley v.

Weinberger, 537 F.2d 1179, 1181 (4th Cir. 1976)[finding that the objective medical evidence, as

opposed to the claimant's subjective complaints, supported an inference that he was not disabled];

Parris v. Heckler, 733 F.2d 324, 327 (4th Cir. 1984) ["[S]ubjective evidence . . . cannot take

precedence over objective medical evidence or the lack thereof." (citation omitted)]; see also Cruse

v. Bowen, 867 F.2d 1183, 1186 (8ʰ Cir. 1989)["The mere fact that working may cause pain or

discomfort does not mandate a finding of disability]; Bowen, 482 U.S. at 146 [Plaintiff has the burden

to show that he has a disabling impairment]. Therefore, Plaintiff's credibility argument is without

merit.

15



## II.

### (Listings)

Plaintiff also alleges that the ALJ erred in failing to identify what specific Listing was applicable to his case and in what specific way he failed to satisfy those criteria. In doing so, Plaintiff argues that Listing 1.04[9] may be applicable to his condition, and asserts that "the medical record arguably demonstrates that his cervical spine condition satisfied the criteria of 1.04 A, B, AND C." Plaintiff's Brief at 23. However, while not specifically referencing to Listing 1.04, the ALJ found in her decision that Plaintiff's impairments (both alone and in combination) did not meet or medically equal the severity of any listed impairment, noting that she had "carefully considered the criteria of *the Listings applicable to [Plaintiff's] impairments* and find his impairments, individually or in combination, do not meet or equal such criteria". (R.p. 14). (emphasis added).

---

[9]This Listing provides:

1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04.

16



While an ALJ generally should identify relevant listed impairments being considered and compare the listed criteria to the evidence of a claimant's symptoms; Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986); Cook does not establish "an inflexible rule requiring an exhaustive point-by-point discussion in all cases." Russell v. Chater, 60 F.3d 824, at *3 (4th Cir. 1995); see also, Green v. Chater, 64 F.3d 657 (4th Cir. 1995)[Finding that ALJ adequately explained his evaluation of the claimant's impairments even though he did not explicitly address why specific listings were not met]. The Fourth Circuit has also held that it is not necessary to mention a specific listing where, reading the ALJ decision as a whole, "substantial evidence supports the finding at step three of the sequential evaluation process as the ALJ's analysis at subsequent steps of the evaluation are inconsistent with meeting (a listing)." Smith v. Astrue, 457 F. App'x 326, 328 (4th Cir. 2011), citing Fischer-Ross v. Barnhart, 431 F.3d 729, 733 (10th Cir. 2005); see also Ketcher v. Apfel, 68 F.Supp.2d 629, 645–646 (D.Md. 1999). As such, a brief explanation at step three is acceptable where the ALJ's discussion of the evidence at other steps of the evaluation make it clear that the ALJ considered the records relevant to the step three analysis. See Smith v. Astrue, 457 F. App'x at 328 ; McCartney v. Apfel, 28 F. App'x 277, 279–80 (4th Cir. 2002). Kiernan v. Astrue, No. 3:12CV459-HEH, 2013 WL 2323125, at *5 (E.D. Va. May 28, 2013) ["Where the ALJ analyzes a claimant's medical evidence in one part of his decision, there is no requirement that he rehash that discussion in his Step 3 analysis."]. The ALJ's decision here satisfies these requirements.

Indeed, Plaintiff has not himself even argued how he meets this particular Listing, other than to generally argue that the medical evidence supports it. Notably, although it is the claimant who bears the burden of demonstrating that his impairment meets or equals a listing, in his pre-hearing brief submitted to the ALJ, Plaintiff did not assert that he met or equaled any of the

17



Listings. (R.p. 194). See Kellough v. Heckler, 785 F.2d 1147, 1152 (4th Cir. 1986); see also Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992)[claimant has the burden of production and proof at Steps 1 to 4 of the sequential evaluation process]. Even in his brief to this Court, Plaintiff has only made a general argument that he met this Listing, and has not specifically set forth how he met or equaled all of the requirements of Listing 1.04. See Sullivan v. Zebley, 493 U.S. at 530 ["For a claimant to show that his impairment matches a Listing, he must show that it meets *all* of the specified criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify."]. Plaintiff has not asserted nor has he presented medical evidence to support a finding that his spinal condition resulted "in compromise of a nerve root (including the cauda equana) or the spinal cord." Similarly, Plaintiff has not indicated evidence showing compromise of the nerve root or spinal cord in paragraph A of Listing 1.04. As to paragraph B of Listing 1.04, the record contains no evidence of spinal arachnoiditis, and as to paragraph C, there is no medically acceptable imaging concerning any lumbar spinal stenosis, nor has Plaintiff asserted or presented evidence of an inability to ambulate effectively.

Conversely, although the ALJ did not specify the Listings she considered, she discussed Plaintiff's medical records as to his impairment at length, including MRIs and radiological evidence, in sections 3 and 5 of her decision. As discussed by the ALJ, Dr. Toussaint noted in January 2012 (after obtaining an MRI of Plaintiff's cervical spine) that he had difficulty relating Plaintiff's bilateral upper extremity symptoms to the MRI findings. The ALJ also noted that there were no signs of myelopathy. (R.p. 12, 256). The January 2012 MRI report indicates there was no abnormal signal within the cord. (R.p. 257). The impression from a March 2012 EMG was that the nerve conduction studies of the median and ulnar nerves bilaterally were unremarkable, there was



no clear evidence of thoracic outlet syndrome, and there were only very slight changes noted in Plaintiff's left upper extremity which might be of no clinical significance although possible mild C8 irritation on the left might be a consideration. (R.pp. 12, 223). A cervical CT scan in May 2012 showed developmental fusion at C2-3, and multilevel disc protrusion with no more than mild canal stenosis and mild spondylitic changes. (R.pp. 13). Further, in reaching her decision the ALJ also gave considerable weight to the opinions of the state agency physicians, both of whom found that Plaintiff's condition did not meet or equal a Listing. (R.p. 15). While Dr. Key (like the ALJ) did not reference a particular Listing in his finding, Dr. Humphries specifically considered Listing 1.04 in determining in her report that Plaintiff did not meet or equal a Listing. (R.p. 70). Dr. Humphries noted that as part of her determination, she had reviewed Plaintiff's EMG, the most recent cervical spine radiological findings, the results of Dr. Daniel's consultative examination, and treatment records from Dr. Toussaint and Dr. Riber. (R.pp. 69-70, 72).

Although Plaintiff contends that the ALJ should have gone into more detail in her Listing analysis, a review of the decision confirms that the ALJ specifically stated that she had considered the Listings applicable to Plaintiff's condition, and supplemented her discussion of the medical evidence relating to this finding later in her decision. The ALJ's arguable lack of artfulness in setting forth this finding is not a basis to overturn the decision based on the facts of this case and in light of the fact that the ALJ specifically stated that she found that Plaintiff did not meet or equal any Listing "applicable to [his] impairments" and clearly reviewed the evidence relevant to Listing 1.04. Fischer-Ross, 431 F.3d at 734 [Remand is not required "for a more thorough discussion of the listings when confirmed or unchallenged findings made elsewhere in the ALJ's decision confirm the step three determination under review"]; see Senne v. Apfel, 198 F.3d 1065, 1067 (8th Cir. 1999) ["a



deficiency in opinion-writing is not a sufficient reason for setting aside an administrative finding where the deficiency had no practical effect on the outcome of the case."]; Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996) ["An arguable deficiency in opinion-writing technique is not a sufficient reason for setting aside an administrative finding where . . . the deficiency probably had no practical effect on the outcome of the case"], quoting Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987); see also Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1999)["No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result"]; Davis v. Astrue, No. 07–231, 2008 WL 540899, at *3 (D.S.C. Feb. 22, 2008) [recognizing harmless error analysis].

### III.

### (Combination of Impairments)

Plaintiff's final claim is that the ALJ erred by failing to properly consider the combination and effects of all of his impairments. See Walker v. Bowen, 889 F.2d 47 (4th Cir. 1989)[Holding that disability may result from a number of impairments which, taken separately, might not be disabling, but whose combined effect, taken together, is sufficient to render a claimant unable to engage in substantial activity]. He argues that his impairments in combination increased his functional limitations, that a proper consideration of his combination of impairments would result in the ALJ finding him more credible, and that the ALJ failed to factor in the detrimental effect of his prescription medications.

Plaintiff is correct that, where appropriate, an ALJ should consider the type, dosage, and side effects of a claimant's medications in reaching his or her decision. See SSR 96-7p [RFC assessment must be based on all of the relevant evidence, including side effects of medication]; see

20



also <u>Hamilton v. Barnhart</u>, 158 F. App'x 68 (9th Cir. 2005)[Where the record contains evidence supporting a Plaintiff's claims regarding side effects, side effects are a factor to be considered in the formulation of an RFC]; <u>Jackson v. Colvin</u>, No. 13-1560, 2014 WL 2154260, at * 1 (W.D.Wa. May 22, 2014)["An ALJ should consider all factors that might have a significant impact on an individual's ability to work, including side effects of medications"].  However, contrary to Plaintiff's argument, the ALJ *did* consider Plaintiff's alleged medication side effects in reaching her decision.  The ALJ discussed Plaintiff's testimony concerning the side effects of his medications, noted where Plaintiff indicated his medications were working reasonably well for him, and found that on those occasions when Plaintiff reported side effects to his physicians they changed or adjusted his medications to alleviate any side effects.  Additionally, the ALJ also noted that any alleged medication side effects did not prevent Plaintiff from performing significant daily activities.  (R.pp. 11, 13, 15).  Hence, a plain reading of the decision does not support Plaintiff's claim that the ALJ failed to consider the effects of Plaintiff medications in his RFC.  Plaintiff simply disagrees with the ALJ's conclusions.

Otherwise, a review of the decision shows that the ALJ properly considered the combined effect of Plaintiff's severe and non-severe impairments in considering Plaintiff's impairments at each step of the sequential evaluation process.  At step two, the ALJ discussed all of Plaintiff's severe and nonsevere impairments (R.pp. 11-13), and at step three she specifically stated that she had considered Plaintiff's impairments both singly and in combination and found that Plaintiff did not have an impairment or *combination* of impairments that met or medically equaled a listed impairment  (R.p. 14).  See <u>Flaherty v. Astrue</u>, 515 F.3d 1067, 1071 (10th Cir. 2007)[ALJ should be taken at his word when he states that he considered all of the claimant's impairments in combination].  The ALJ also noted that she had carefully considered all of Plaintiff's symptoms and

21



referred to her prior (Finding 3) discussion of all of Plaintiff's severe and non-severe impairments in her RFC analysis. (R.pp. 11-13, 14-16). See Wright v. Astrue, No. 2:10-2449-DCN-BHH, 2011 WL 5403104, at *7-8 (D.S.C. Oct. 18, 2011)[affirming ALJ's decision where he stated he considered the claimant's combination of impairments and discussed each impairment at some point in the decision, and where he did not offer any reason to conclude that further consideration would have produced a different result], adopted, 2011 WL 5403070 (D.S.C. Nov. 8, 2011); Miller v. Astrue, No. 08-62, 2009 WL 2762350 at * * 13-14 (E.D.Mo. Aug. 28, 2009)["Where an ALJ separately discusses the claimant's impairments and complaints of pain, as well as her level of activity, it cannot be reasonably said that the ALJ failed to consider the claimant's impairments in combination"]; Hewitt v. Colvin, No. 14-3790, 2015 WL 9216653, at * 2 (D.S.C. Dec. 17, 2015).  Finally, the ALJ discussed Plaintiff's impairments and limitations imposed by the combination of his impairments in her hypothetical question to the VE.  (R.pp. 49-50).

Plaintiff has failed to establish any error in the ALJ's review and consideration of the effects of his medical problems on his ability to work, including the effect of the combination of those impairments.  Martise v. Astrue, No 08-1380, 2010 WL 889826 at * 23 (E.D. Mo. Mar. 8, 2010)[ALJ sufficiently considered Plaintiff's impairments in combination by summarizing Plaintiff's medical records and separately discussing each of Plaintiff's alleged impairments] (citing Hajek v. Shalala, 30 F.3d 89, 92 (8th Cir. 1994)[conclusory statement that ALJ did not consider combined effects of impairments was unfounded where ALJ noted each impairment and found that impairments, alone or combined, were not of listing-level severity]; see also Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992)[Finding that separate discussion of all of a plaintiff's impairments with the conclusion that these impairments did not prevent the plaintiff from performing her past



relevant work was sufficient to establish that the ALJ did not consider Plaintiff's impairments were disabling in combination, and that to "require a more elaborate articulation of the ALJ's thought processes would not be reasonable"]; Waxvik v. Apfel, No. 99-152, 2001 WL 1820373, at * 4 (D.N.D. Mar. 12, 2001); Isaacs v. Shalala, No. 92-4101, 1994 WL 247276, at * 5 (N.D. Iowa Mar. 11, 1994) Wilfong v. Shalala, No. 93-472, 1994 WL 780186, at * 4 (D.Minn. Oct. 18, 1994); see also Williams v. Colvin, No. 11-2344, 2013 WL 877128, at *3 (D.S.C. Mar. 8, 2013); Simmons v. Astrue, No. 11-2729, 2013 WL 530471, at * 5, n. 7 (D.S.C. Feb. 11, 2013)["When considering whether the ALJ properly considered the combined effects of impairments, the decision must be read as a whole"]; Glockner v. Astrue, No. 11-955, 2012 WL 4092618, at * 4 (D.S.C. Sept. 17, 2012). This argument is therefore without merit.

### Conclusion

Substantial evidence is defined as "... evidence which a reasoning mind would accept as sufficient to support a particular conclusion." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984). As previously noted, if the record contains substantial evidence to support the decision (i.e., if there is sufficient evidence to justify a refusal to direct a verdict were the case before a jury), this Court is required to uphold the decision, even should the Court disagree with the decision. Blalock, 483 F.2d at 775.

Under this standard, the record contains substantial evidence to support the conclusion of the Commissioner that the Plaintiff was not disabled within the meaning of the Social Security Act during the relevant time period. Therefore, it is recommended that the decision of the Commissioner be affirmed.



The parties are referred to the notice page attached hereto.

_____
Bristow Marchant
United States Magistrate Judge

April 20, 2016
Charleston, South Carolina



**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. ./Schronce, 727 F.2d 91 (4th Cir. 1984).

